upon the courts to decline to entertain the action, he must show that he has given or is willing to give, to the seamen that hearing which the treaty intends they should have. Here the vice-consul himself testifies, "No adjudication was made in writing—a memorandum only was made. It was noted on the protocol as follows: 'A requisition has been made and given to the captain to be given to the court.'" The making such an entry is not sitting as judge or arbitrator on the present demand. To hold, on such proof, that the vice-consul has acted as judge or as arbitrator in respect to this demand, would countenance a mode of procedure which I should be sorry to see obtain. My conclusion, therefore, is that there has been no such examination and adjudication of the matter in hand by the consul as the courts require and the treaty intends to secure.

In the absence then of any legal limitation of the jurisdiction of the court by the treaty, and in the absence of any proof of such action on the part of the consul as should call upon the court to decline to entertain the action, I deem it my duty to proceed to render a decree—and I do this the more willingly because the master of this vessel is half owner of her, and is here present, where also the seamen are—and because the ship is laid up here by reason of war, nor can it be told when, if ever, she will return to her home. It is a vain thing, therefore, to say to these sailors, who, although having some $1,100 of wages due, and unpaid, are left paupers, that they must go to Prussia, and there await the return of the ship in order to enforce their demand. If they cannot now maintain this action, they are practically deprived of all remedy, and thrown upon this community penniless. Against such a result my sense of justice revolts, and I am unwilling to believe that it is compelled by the law. I, therefore, without hesitation, pronounce in this case the decree which the maritime law, applied to the facts, requires, and condemn the vessel to pay the wages of the men.

In considering this case thus far, I have treated the action of the vice-consul as equivalent to that of the consul, and have so spoken of it. In point of fact, Dr. Roesing, the consul-general who signed the requisition, which is the only official act proved, aside from the memorandum on the protocol, never saw either the master or the men, the vice-consul acting for him in everything, except signing the requisition. I have also spoken of the consul as the consul of Prussia, and have considered him to be the official referred to in the treaty with Prussia.

The point has been taken that the proofs show Dr. Roesing to be consul-general of the North German Union; that there are now no consuls of Prussia, nor any similar treaty with the North German Union. But it appears, from the law, proved, that the consul of the North German Union is the consul of each power comprehended in the Union, which is a confederation rather than a Union. Besides, the executive department recognizes Dr. Roesing as the consul of Prussia, by virtue of his appointment as consul-general of the North German Union, and the courts are bound by the action of the executive in such a matter, the question being political, and not judicial.

There remains to allude to the phase of the case which is presented by the fact that the libel is filed by Newman, the mate, to recover his own wages, and also the wages of the other men, as the assignee of their demands. So far I have treated the case as if all the men were parties libellant.

The evidence shows the execution of a formal assignment to the mate of the claims of the other men, but it also appears that the assignment was without consideration, and that the men all expect to receive whatever may be recovered as their wages. This mode of procedure to save multiplicity of suits seems to have been adopted in ignorance of the rule of the admiralty, which enables several seamen to join in one action; and the mate, upon the trial, filed a consent that the other men be now joined as co-libellants, and receive in their own persons whatever might be awarded for their claims. Upon such a consent and such facts, I deem it competent to permit all the seamen to join in the action, upon petition to be made co-libellants, and, on showing the cancellation of their assignments to the mate, to take a decree in their own names for the wages found due them. Two of them are minors, it is true, but, in the admiralty, minors who are mariners are permitted to sue for their wages in their own names. All seamen are in a certain sense treated as minors in maritime courts.

In accordance with these views, let a decree be entered in favor of the mate, for his wages earned in the services of this vessel, and still unpaid, with a reference to ascertain the amount, and let similar decrees be made in favor of the seamen, upon the filing of their petition, and showing the cancellation of their assignments to the mate.

## Case No. 4,428.

In re ELY.

[5 Law Rep. 323.]

District Court, S. D. New York. 1843.

On the coming in of the commissioner's report, exceptions were taken by the bankrupt [John Ely] to the competency of the opposing party to the objections on the ground that she was not a creditor. On the 9th March, 1835, the bankrupt executed a bond and mortgage to Mrs. Traphagen. She assigned the bond and mortgage to Bernard L. Simpson, May 1, 1836, to secure a debt owing him, and also the payment of rent, &c., on premises leased of him, and stipulated that the assignment should become absolute on her failing to pay. Simpson assigned his interest therein to Mr. Cram, May 14th. In 1841, Cram sued the bond in the name of Mrs. T., and recovered judgment; his claims against Mrs. T. would absorb the judgment within about $200. Messrs. Grahams prosecuted a creditor's bill against Mrs. T., and April 12, 1841, she assigned to a receiver in that suit, all her estate, effects, interests, &c., &c., but she is contesting the creditor's bill with the complainants, and the case yet remains undecided between them. The court held, that the assignment to Simpson, notwithstanding the absolute clause on her default to pay, was only by way of security, and did not render the bond his property, or that of his assignee. That the assignment of Mrs. T. under the creditor's bill, only placed her effects in the custody of the law, and did not transfer her title so entirely but that she possessed an interest dependent only upon the termination of the chancery suit in her favor. If in judgment of law, she no longer stood in the relation of creditor to the bankrupt, she was interested in obtaining the whole debt from him, as that would increase the funds passed to the receiver in extinguishment of the claim in chancery, and furthermore, because if that bill is displaced, equity would secure the restoration of the fund to her. The act [of 1841 (5 Stat. 440)] authorizes creditors who have proved their debts, and other persons in interest, to oppose the discharge, and in the one character or other she makes out a clear title to file the objections. Exceptions overruled.

E. H. Ely, for bankrupt.
Benedict & Belknap, for creditors.

## Case No. 4,429.

### In re ELY.

[1 N. Y. Leg. Obs. 343.]

District Court, S. D. New York. Dec. 31, 1842.

W. Skidmore, for bankrupt.
Carter, Edgerton, Schell, Mason, Marbury & Low, for creditors.

BETTS, District Judge. Previous to the petition by creditors, filed June 17, 1842, to obtain a decree of bankruptcy, the bankrupt assigned all his real and personal estate to be applied amongst his creditors pro rata, and without preference. The first deed of assignment was executed the 26th day of May, and the second the 14th day of June, 1842. These were no unlawful preferences by the bankrupt, which bar his discharge. Whether the assignees can hold and distribute the property under the trusts, or it passes by the decree of bankruptcy to the official assignee, is not a question now necessary to decide. The objection, that it amounts to a fraudulent preference is not sustained. The act of bankruptcy committed by the debtor, and the only one charged in the petition, was concealing himself to avoid being arrested, &c. This is not one of the particulars made by the act a cause for denying the bankrupt a discharge and certificate: no mere act of bankruptcy, not of fraudulent character, can have that effect under the statute. This objection is therefore untenable.

The bankrupt has not filed an inventory of his estate, or list of his creditors, &c., and that is alleged as another ground why he should not receive his discharge. The statute does not enjoin this proceeding in the case of compulsory bankruptcy. It is made necessary that the voluntary bankrupt should do it in order to obtain a decree of bankruptcy, but with that class of bankrupts it is not part of the procedure consequent upon such decree, and necessary to obtain a discharge. It might be meet and convenient that the practice should be so in regard to bankrupts, declared such in compulsory proceedings, but no provisions of the act, and no rule of the court enjoins it, and accordingly the party here has been guilty of no default in the omission. The objections are all overruled, and disallowed.